STATE EX REL. WARREN, Attorney General, Petitioner, and PANITCH, by Guardian *ad litem,* individually and as a member of a class, Intervening Petitioner, v. NUSBAUM, Secretary, Department of Administration, Respondent.

*No. State 2 (August Term, 1974). Argued June 3, 1974.—*
*Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 577.)

316

For the petitioner the cause was argued by *John William Calhoun,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

For the intervening petitioner there was a brief by *Alan Marcuvitz* and *Howard B. Schoenfeld,* attorneys, and *Peregrine, Marcuvitz, Cameron & Peltin, S. C.,* of counsel, all of Milwaukee, and oral argument by *Alan Marcuvitz.*

For the respondent there was a brief by *Steven I. Cohen* and *Cohen, Grant, Liebmann & Conway, Ltd.,* all of Green Bay, and oral argument by *Gregory B. Conway.*

HANLEY, J.   Ch. 89, Laws of 1973, became effective on August 9, 1973.   Ch. 89 is a comprehensive act whose purpose is to provide comparable educational benefits without charge to those children with exceptional educational needs.   Such, the legislature declared, was the policy of the state of Wisconsin.

"(2) Furthermore, it is the policy of this state to ensure that each child who has exceptional educational needs is provided with the opportunity to receive a special education at public expense suited to his individual needs. To obtain this end, the legislature recognizes the necessity for a flexible program of special education and for frequent reevaluation of the needs, capabilities and progress of a child with exceptional educational needs.

"(3) The legislature also recognizes that it is the responsibility of the school district in which a child with exceptional educational needs resides to ensure that the child is able to receive an education at public expense which is tailored to his needs and capabilities.   Special assistance, services, classes or centers shall be provided whenever necessary."   Sec. 1 (2) and (3) of ch. 89, Laws of 1973.

There are approximately 1,188,166 children presently enrolled in the public and private schools in the state of Wisconsin.   Of these children, it is estimated that about 10 percent are handicapped [1] in some fashion.[2]   Prior to

---

[1] Handicapped as used herein is defined in the statutes as:

"(3) 'Child with exceptional educational needs' means any child who has a mental, physical, emotional or learning disability which, if the full potential of the child is to be attained, requires educational services to the child to supplement or replace regular education.   Children with the following conditions, in addition to children with such other conditions as the state superintendent determines, may require educational services to supplement or replace regular education:

"(a) Physical, crippling or orthopedic disability.

"(b) Mental retardation or other developmental disabilities.

the enactment of ch. 89, Laws of 1973, these children were generally without services from those public schools of the state of Wisconsin [3] which were created to provide free public education to the children of Wisconsin.

"(c) Hearing impairment.

"(d) Visual disability.

"(e) Speech or language disability.

"(f) Emotional disturbance.

"(g) Learning disability.

"(h) Pregnancy, including up to 2 months after the birth of the child or other termination of the pregnancy.

"(i) Any combination of conditions named by the state superintendent or enumerated in pars. (a) to (h)." Sec. 115.76, Stats. 1973.

[2] The Wisconsin department of public instruction estimates that approximately 104,700 children in the state of Wisconsin are handicapped:

|  | Est. Number of Handicapped | Est. % of Total School Population |
|---|---|---|
| Mentally Retarded | 23,000 | 2.3% |
| Speech Impaired | 35,000 | 3.5% |
| Emotionally Disturbed | 20,000 | 2.0% |
| Learning Disabled | 20,000 | 2.0% |
| Deaf, Hard of Hearing | 1,100 | 11.0% |
| Physically Handicapped, Homebound | 5,000 | .5% |
| Visually Handicapped | 600 | .06% |

This estimate does not include those children handicapped by reason of pregnancy, sec. 115.76 (3) (h), Stats.

[3] The Wisconsin department of public instruction estimated that only 52,882 children, or approximately 50.5 percent of those handicapped, were served by the public schools in 1972–1973.

|  | Number Served by Public Schools 1972–73 | % of Handicapped Served |
|---|---|---|
| Mentally Retarded | 17,480 | 76% |
| Speech Impaired | 28,000 | 80% |
| Emotionally Disturbed | 1,200 | 6% |
| Learning Disabled | 1,600 | 8% |
| Deaf, Hard of Hearing | 1,012 | 92% |
| Physically Handicapped, Homebound | 3,200 | 64% |
| Visually Handicapped | 390 | 65% |

Under ch. 89, Laws of 1973, children are to be screened by the school district at the time of their enrollment in order to determine whether the child has any exceptional needs.[4] Additionally, any parent, physician, nurse, social worker or administrator of a social agency who has reasonable cause to believe that a child has exceptional educational needs must report such information to the school board.[5] Thereafter the child is examined by a "multidisciplinary team" and a recommendation is made as to whether special education "fitted to the individual child's needs" is in his "best interest."[6] If such special education is required, it is the responsibility of the school district to so provide.[7]

In order to implement the provisions of ch. 89, Laws of 1973, and so provide for the needs of those children with exceptional needs, a great investment in services and capital is required. For example, it is estimated that the number of teachers necessary to serve the children with exceptional educational needs would be more than those presently employed.[8] Generally the present public facilities in Wisconsin for the education of handicapped children are inadequate to meet their educational needs. Thus the legislature provided for alternative sources for procuring special educational services if local public services were not available.

Initially, if the school district or the cooperative educational service agency for the school district in which the child resides operates a special educational program, then

[4] Sec. 115.80 (2), Stats.

[5] Sec. 115.80 (1), Stats.

[6] Sec. 115.80 (3), Stats.

[7] Sec. 115.85 (3), Stats.

[8] The Wisconsin department of public instruction estimated that there are presently 2,611 teachers (exclusive of teachers for homebound students) employed in educating Wisconsin's handicapped students. Similarly it was estimated that this number would have to rise to approximately 5,435 in order to service all the handicapped students in Wisconsin.

the child must be placed in that program.[9] If such a program does not exist, then the child must be placed in a public agency of this state offering such an educational program as near as possible to the child's residence.[10] If such a program is not available, and if no such educational program may be procured from a public agency in another state,[11] then the school board may, on approval of the state superintendent, contract with a private educational service so as to provide such a special educational program.[12] The governing board, faculty, student body and teachings of that private special educational service must not, however, be "chosen or determined by any religious organization or for any sectarian purpose." [13]

The reason the provision for use of the special educational programs of private institutions is necessary at least temporarily if the state is to provide equal educational opportunities to handicapped childen is obvious and so stipulated. There are not enough programs presently existing. It is this provision, however, that the respondent contends is unconstitutional as violating the first amendment of the United States Constitution [14] and art. I, sec. 18 of the Wisconsin Constitution.[15]

[9] Sec. 115.85 (2) (a), Stats.

[10] Sec. 115.85 (2) (b), Stats.

[11] Sec. 115.85 (2) (c), Stats.

[12] Sec. 115.85 (2) (d), Stats.

[13] Sec. 115.85 (2) (d), Stats.

[14] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[15] "The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

We must determine whether the provisions of sec. 115.85 (2) (d), Stats., transgress on either the "establishment" or "free exercise" clauses of the first amendment or whether it can be determined to be in ". . . the boundaries of the neutral area between these two provisions within which the legislature may legitimately act." *Tilton v. Richardson* (1971), 403 U. S. 672, 677, 91 Sup. Ct. 2091, 29 L. Ed. 2d 790, rehearing denied, in 404 U. S. 874, 92 Sup. Ct. 25, 30 L. Ed. 2d 120. Likewise we must determine whether this legislative enactment violates any provisions of art. I, sec. 18 of the Wisconsin Constitution.

In an attempt to focus on the three main evils which the "[Establishment Clause was intended to afford protection:] sponsorship, financial support, and active involvement of the sovereign in religious activity" *Walz v. Tax Commission* (1970), 397 U. S. 664, 668, 90 Sup. Ct. 1409, 25 L. Ed. 2d 697, the United States Supreme Court has promulgated a three-pronged test to be applied in determining the constitutionality of a legislative pronouncement.

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, . . . finally, the statute must not foster 'an excessive government entanglement with religion.' [citations omitted]" *Lemon v. Kurtzman* (1971), 403 U. S. 602, 612, 613, 91 Sup. Ct. 2105, 29 L. Ed. 2d 745.

It is this test that must be applied in determining the constitutionality of sec. 115.85 (2) (d), Stats. Since this action is before this court on the pleadings and stipulation of facts, our decision is necessarily limited thereto. Under the facts we can only determine whether sec. 115.85 (2) (d) is unconstitutional on its face. While in application thereof, some constitutional infirmity may

arise, such a situation would, however, have to be determined on its individual facts.

"Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics. We cannot, however, strike down an Act of Congress on the basis of a hypothetical 'profile.'" *Tilton v. Richardson, supra,* at page 682.

*Secular purpose.*

The legislative purpose of ch. 89, Laws of 1973, is made clear in the legislature's recitation of policy.[16]

". . . [T]o ensure that each child who has exceptional educational needs is provided with the opportunity to receive a special education at public expense suited to his individual needs." Sec. 1 (2) of ch. 89, Laws of 1973.

Such a legislative declaration of policy is given great weight.[17]

The propriety of providing for the special educational needs of handicapped children in the state of Wisconsin goes without question. Such is beyond a doubt the most bona fide of public purposes. However, the propriety of such a legislative purpose does not immunize ch. 89, Laws of 1973, from further constitutional challenge. If sec. 115.85 (2) (d), Stats., either has a primary effect which advances religion or if it fosters excessive entanglements

---

[16] Sec. 1 of ch. 89, Laws of 1973.

[17] *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 212, 170 N. W. 2d 790, holding: "Although this court is not bound by the declaration of public purpose contained in an act, nevertheless what constitutes a public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. . . ."

*See also: State ex rel. Warren v. Nusbaum* (1972), 55 Wis. 2d 316, 323, 198 N. W. 2d 650; *Committee for Public Education v. Nyquist* (1973), 413 U. S. 756, 93 Sup. Ct. 2955, 37 L. Ed. 2d 948, 963.

between church and state, then said section is constitutionally infirm and must be struck down.

*Primary effect.*

The question is whether a contractual arrangement between a local school board and a sectarian special educational service to provide a special educational program to the handicapped children residing in that school district is unconstitutional in that it renders aid and directly subsidizes that sectarian institution in furtherance of its religious purpose.

Initially it must be recognized that the mere contracting for goods or services for a public purpose with a sectarian institution is appropriate state action.[18] It is only when such a contract has a primary effect of advancing religion that the constitutional prohibitions come into effect.

In identifying the primary effect the court in *Hunt v. McNair* (1973), 413 U. S. 734, 742, 93 Sup. Ct. 2868, 37 L. Ed. 2d 923, stated: ". . . Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." *E.g., Bradfield v. Roberts* (1899), 175 U. S. 291, 20 Sup. Ct. 121, 44 L. Ed. 168; *Walz v. Tax Commission* (1970), 397 U. S. 664, 90 Sup. Ct. 1409, 25 L. Ed. 2d 697; *Tilton v. Richardson, supra.* Stated another way, the court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.

---

[18] "We see nothing inappropriate in such contractual approach. The state may contract for the procurement of supplies or services required for the carrying on of its public purposes. It may purchase from or even aid a religious or church-related institution in securing goods or services for a public purpose." *State ex rel. Warren v. Nusbaum, supra,* at page 321.

Aid may normally be thought of as having the primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting. In *Tilton v. Richardson, supra,* the court refused to strike down a direct federal grant to four colleges and universities in Connecticut. Mr. Chief Justice BURGER, for the plurality, concluded that despite some institutional rhetoric, none of the four colleges was pervasively sectarian, but held open that possibility for future cases:

"Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics." *Tilton v. Richardson, supra,* at page 682.

While the educators and staff involved in such a laudable endeavor as the providing of special educational services may generally be of a singular religious denomination, such is insufficient to characterize their conscious or subconscious attitudes as necessarily religiously directed. We do not question the religious background of our legislators, executive officers or members of our judiciary in the furtherance of their respective duties and neither may bad faith be presumed on the part of professionals involved in special educational services.

Despite the fact that the primary purpose of special educational institutions is not religious in nature, the legislature has gone to great lengths to insure that the inculcation of religious tenets shall not take place. Sec. 115.85 (2) (d), Stats., provides that, upon approval by the state superintendent, the private special educational service must be one:

"[W]hose governing board, faculty, student body and teachings are not chosen or determined by any religious organization or for any sectarian purpose."

If the special educational service does not so qualify, then the school board is not permitted to contract for the procurement of services. Any violation thereof is challengeable in a later action under the statute and constitutional amendments.

We cannot conclude that the proposed contractual transactions will place the school authorities in the position of providing aid to the religious as opposed to the secular activities of the private institutions. We are satisfied that the implementation of the provisions of sec. 115.85 (2) (d), Stats., will not have the primary effect of advancing religion.

*Excessive entanglements.*

The final question for us to determine is whether sec. 115.85 (2) (d), Stats., would require excessive governmental entanglement with religion. Stated another way, it is necessary to determine whether "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to insure that these restrictions [against the inculcation of religious tenets] are obeyed and the First Amendment otherwise respected." *Lemon v. Kurtzman, supra,* at page 619.

In order to determine whether excessive governmental entanglements with religion will arise, the court in *Lemon* determined that the character and purpose of the institution, the nature of the aid provided and the resulting relationship must be examined. Applying such a test, it is our opinion that sec. 115.85 (2) (d) does not involve such excessive entanglements as to be struck down on constitutional grounds.

It must be emphasized that the character and purpose of the special education of the handicapped is not sectarian in nature. A professional educator of mentally retarded children is not involved in the inculcation of religious tenets. Rehabilitation of the child and not the

proselytizing of religious ideals is the purpose of such special education. Like *Tilton* and *Nusbaum,* the character of the institution is secular.

Likewise, while the nature of the aid granted to the institution is arguably the same as that condemned in *Lemon,* and while such aid is dissimilar to the one-time, single-purpose grant of *Tilton,* this court affirmed a similar program with qualifications in *Nusbaum* as being constitutionally inviolate and as avoiding excessive governmental entanglements.

Sec. 115.85 (2) (d), Stats., carefully safeguards against religiously indoctrinated programs being taught. Presumptively, the school board will not enter into and the state superintendent will not approve contracts in violation of sec. 115.85 (2) (d). The degree of entanglement of government process with religious doctrine will therefore be minimal and not constitutionally objectionable.

Any inspection as may be necessary to ascertain that such facilities are devoted to secular education is minimal. The private schools, similar to state supported schools, must be examined to determine the types and quality of the programs available. At that time it is easily determined whether the institution has a religious purpose as prohibited under sec. 115.85 (2) (d), Stats. If it does, then the statute prohibits any contractual relationship whatsoever. If it does not have a religious purpose, the nature of special education being what it is, no continued surveillance is necessary.

*Wisconsin Constitution.*

The next question here presented is whether the use of private institutions as authorized by sec. 115.85 (2) (d), Stats., is invalid because it violates art. I, sec. 18 of the Wisconsin Constitution. While the words of the United States and Wisconsin Constitutions may dif-

fer, ". . . both . . . provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *State ex rel. Warren v. Nusbaum, supra,* at page 332. Since, as previously discussed, sec. 115.85 (2) (d) does not transgress on such constitutional provisions, the statute is constitutionally inviolate.

While art. I, sec. 18 of the Wisconsin Constitution is similar in construction to the United States Constitution, it does contain the following language:

". . . nor shall any money be drawn from the treasury *for the benefit of* religious societies, or religious or theological seminaries." (Emphasis added.)

This language has been construed by this court as encompassing the "primary effect test" such that:

" 'The crucial question . . . not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.' " *State ex rel. Warren v. Nusbaum, supra,* at page 333, quoting *Tilton v. Richardson, supra,* at page 679.

The primary effect of ch. 89, Laws of 1973, is not the advancement of a religious organization but the providing of special educational services to the handicapped children of Wisconsin, a secular purpose. Some incidental benefit may accrue to a religious organization, as Mr. Justice ROBERT W. HANSEN commented in *Nusbaum:*

" 'For the benefit of' is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section." *Id.* at page 333.

The intervening petitioner asks this court to rule that since the effective date of ch. 89, Laws of 1973, was

August 9, 1973, and since this program has yet to be implemented, that the state is liable for damages which resulted from the placement of his child in a private special educational service in 1973–1974.

Since this is a declaratory action, this court cannot grant damages. It is our opinion that any action for damages should be commenced at the trial court level. We do not reach the issue of liability of the state and local school boards for reimbursement for expenses incurred in attending private nonsectarian schools since August 9, 1973.

We conclude that sec. 115.85 (2) (d), Stats., of the Laws of 1973, does not violate the religious clauses of the first amendment of the United States or art. I, sec. 18 of the Wisconsin Constitutions.

*By the Court.*—Ch. 89, Laws of 1973, is valid and constitutional and respondent is ordered to honor the requisition for the printing of the form as submitted to the department of administration.